# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 1, 2024

Lyle W. Cayce
Clerk

———————

No. 23-20543

———————

Benjamin Benfer,

*Plaintiff—Appellant*,

*versus*

City of Baytown, Texas; Barry Calvert, *Individually*,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-2196

———————————————————————

Before Jones, Smith, and Ho, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

Officer Barry Calvert pulled over Benjamin Benfer and his wife for allegedly running a red light and because their vehicle appeared to match the description of a car that had been reported as stolen. As Calvert exited his patrol car, Benfer and his wife also exited their vehicle. A confrontation ensued, ending with Calvert's siccing his K-9 on Benfer. Benfer and his wife were arrested and prosecuted for resisting arrest and interference with public duties, though all charges were dismissed.

No. 23-20543

Benfer sued Calvert and the City of Baytown under 42 U.S.C. § 1983 and state law, asserting myriad claims relating to the encounter. The district court granted Calvert and the City's motion to dismiss, finding that Calvert had not violated Benfer's constitutional rights, that Benfer's state tort claims were not cognizable under Texas law, and that Benfer had pleaded insufficient facts to support his *Monell* claims. We affirm.

I.

On the night of February 14, 2021, Calvert was on patrol when he received an alert to look for a stolen silver 2020 Toyota RAV4.[1] At 10:42 pm, he spotted a vehicle that appeared to match the description of the stolen vehicle, so he followed it into an apartment complex's parking lot and engaged his emergency lights. The car was Benfer's silver 2020 Mitsubishi Crossover, not the stolen RAV4, but the angle of Calvert's headlights and the lack of natural light made it difficult for Calvert to see the exact make and model of the car he was stopping.

After pulling Benfer over, Calvert immediately exited his patrol car. Benfer also got out of his car and walked toward Calvert, ignoring commands to stop. As Benfer neared Calvert, Calvert tried to restrain him, but Benfer repeatedly broke free of Calvert's grasp and ignored even more commands. During their tussle, Calvert warned Benfer that he had a dog that would bite Benfer if he continued to resist.

During their struggle, Mrs. Benfer began approaching Calvert. At that time, and in a move to subdue Benfer, Calvert pushed him to the ground. Mrs. Benfer reacted by rushing toward and pushing Calvert. Calvert pushed her off, shouted at her to "back up," and called for an assist from his K-9.

---

[1] The alert did not provide the license plate number.

2

No. 23-20543

The K-9 bit and subdued Benfer while Calvert handcuffed Mrs. Benfer. Then, after handcuffing Mrs. Benfer, Calvert returned to his car for a second pair of handcuffs before walking over to Benfer. Held by Calvert's K-9, Benfer had fallen to the ground. But, when Calvert attempted to handcuff Benfer, Benfer struggled, putting his hands behind his back. Calvert's bodycam footage does not make clear whether Benfer resisted, or whether the K-9's biting Benfer's arm impeded his movement.[2] While attempting to handcuff Benfer, Calvert commanded his K-9 to release its bite, but the K-9 maintained its hold. Instead, after finally handcuffing Benfer, Calvert had to pull the K-9 off of him.

Benfer was charged with resisting arrest, but the charge was later dropped.[3] Benfer sued Calvert in federal court under state law and § 1983, averring that Calvert (1) stopped him without reasonable suspicion; (2) arrested him without probable cause; (3) instituted prosecution against him without probable cause; (4) used excessive force; and (5) assaulted him. Benfer also sued the City of Baytown under § 1983, averring that its policies governing the use of K-9s were unconstitutional and that it had failed to train its officers properly.

Calvert and the City moved to dismiss for failure to state a claim. The district court granted that motion, finding that Calvert had not violated Ben-

---

[2] "In reviewing a motion to dismiss, we consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the judge may take judicial notice.'" *Allen v. Hays*, 65 F.4th 736, 742 n.3 (5th Cir. 2023) (quoting 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.34[2], at 12-94 (3d ed. 2022)). Because the expert report, which is incorporated into Benfer's complaint, refers to Calvert's dash cam and bodycam footage, we may consider the footage at this stage.

[3] In Baytown, police officers, not the district attorney, initiate misdemeanor criminal proceedings.

fer's constitutional rights, that Benfer's state tort claim was not cognizable under Texas law, and that Benfer had pleaded insufficient facts to support municipal liability for the City. Benfer timely appealed, challenging each dismissal.

## II.

"We review a Rule 12(b)(6) dismissal *de novo*." *Hodge v. Engleman*, 90 F.4th 840, 843 (5th Cir. 2024). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face."[4] Facial plausibility is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Terwilliger*, 4 F.4th at 279. "These standards are the same when a motion to dismiss is based on qualified immunity." *Id.* at 279–80 (citation omitted). So, a complaint survives dismissal if it "pleads facts that, if true, would permit the inference that defendants are liable under § 1983 and would overcome their qualified immunity defense." *Id.* at 280 (cleaned up). Thus, "[i]t is the plaintiff's burden to demonstrate that qualified immunity is inappropriate." *Id.*

To determine whether a government official is entitled to qualified immunity, we ask "(1) whether the undisputed facts and disputed facts, accepting the plaintiffs' version of the disputed facts as true, constitute a violation of a constitutional right, and (2) whether the defendant's conduct was objectively reasonable in light of clearly established law."[5] So, Benfer "must show (1) 'a violation of an actual constitutional right,' and (2) that

---

[4] *Terwilliger v. Reyna*, 4 F.4th 270, 279 (5th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[5] *Harmon v. Dall. Cnty.*, 927 F.3d 884, 892 (5th Cir. 2019) (per curiam) (quoting *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015)).

'the right was clearly established at the time of violation.'"[6]  Because Benfer does not plausibly allege any violations of his constitutional rights, we do not address whether they were clearly established.

## III.

## A.

Benfer posits that Calvert violated his clearly established rights under the Fourth and Fourteenth Amendments by pulling him over without reasonable suspicion.  The district court found that the pleaded facts provided Calvert with reasonable suspicion to stop Benfer, and, accordingly, that Benfer had failed to allege plausibly that Calvert stopped him unconstitutionally. We agree.

"The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc).  Such stops comport with the Constitution if they are supported by reasonable suspicion. *See United States v. Walker*, 49 F.4th 903, 906–07 (5th Cir. 2022).  "An alert or be on the lookout report may provide the reasonable suspicion necessary to justify an investigatory stop." *Davila v. United States*, 713 F.3d 248, 258 (5th Cir. 2013) (cleaned up).  Any stop must be "justified at its inception" and, if so justified, "the officer's subsequent actions [must be] reasonably related in scope to the circumstances that justified the stop." *Brigham*, 382 F.3d at 506 (citing *Terry v. Ohio*, 392 U.S. 1, 88 (1968)).

Calvert's stop was justified at its inception.  Calvert had received an alert to look for a stolen silver 2020 Toyota RAV4, and Benfer was driving a

---

[6] *Escobar v. Montee*, 895 F.3d 387, 393 (5th Cir. 2018) (quoting *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016)).

similar-looking Mitsubishi Crossover.[7] Calvert saw Benfer's car through the rain, at night, and the decreased visibility made it difficult for Calvert to know that he had stopped the wrong kind of car.

Because Benfer's vehicle bore sufficient similarity to the silver RAV4 Calvert was instructed to look for and the conditions in which the stop occurred prevented Calvert from realizing his mistake, the stop was reasonably warranted and justified at its inception.

The stop was also reasonable in duration because Calvert's "subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Brigham*, 382 F.3d at 506. Calvert had barely exited his patrol car when Benfer left his vehicle, walked towards Calvert, and resisted arrest. Mrs. Benfer also left their vehicle and approached Calvert. The remainder of the stop was focused on subduing Benfer and his wife—Calvert never had a chance to verify that Benfer's vehicle was not the stolen RAV4. Therefore, the stop "last[ed] no longer than [was] necessary to effectuate [its] purpose . . . ." *Id.* at 507.

Benfer failed to allege plausibly that Calvert's stop violated his constitutional rights, so the district court properly dismissed that claim.

B.

Benfer contends that Calvert violated his clearly established rights under the Fourth and Fourteenth Amendments by arresting him without probable cause. The district court found that Calvert had probable cause to

---

[7] Calvert avers that he also had reasonable suspicion to stop Benfer because Benfer ran a red light. The relevant dash cam footage, however, does not show any traffic violation. Thus, at the motion-to-dismiss stage, it is plausible that the stop may not have been justified if Benfer committed no traffic violation. But Calvert's reasonable belief that Benfer was driving the stolen RAV4 provided reasonable suspicion to justify the stop.

arrest Benfer for resisting arrest. We agree.

"An arrest is unlawful unless it is supported by probable cause." *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004) (citation omitted). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. Levine*, 80 F.3d 129, 132 (5th Cir. 1996) (citation omitted).

Benfer was arrested for resisting arrest. "A person" resists arrest "if he intentionally prevents or obstructs a person he knows is a peace officer . . . from effecting an arrest . . . by using force against the peace officer . . . ." Tex. Pen. Code § 38.03(a). "It is no defense . . . that the arrest or search was unlawful." *Id.* at § 38.03(b). That means, "[i]n Texas, the act of resisting can supply probable cause for the arrest itself . . . ." *Ramirez v. Martinez*, 716 F.3d 369, 376 (5th Cir. 2013). And "[t]he great weight of Texas authority indicates that pulling out of an officer's grasp is sufficient to constitute resisting arrest." *Id.* (collecting cases).

The video unambiguously shows Benfer repeatedly pulling out of Calvert's grasp. Those acts of resisting supplied probable cause for the arrest.

Benfer has not plausibly pleaded that Calvert violated his constitutional rights when arresting him for resisting arrest, so the district court properly dismissed that claim.

## C.

Benfer avers that Calvert violated his clearly established rights under the Fourth and Fourteenth Amendments by prosecuting him for resisting arrest. The district court dismissed the § 1983 claim for malicious prosecution, finding that there was probable cause to charge Benfer with resisting

arrest. We agree.

"[T]he gravamen of the Fourth Amendment claim for malicious prosecution . . . is the wrongful initiation of charges without probable cause."[8] Meaning, if Calvert had probable cause to charge Benfer, then Benfer's claim must fail.

As discussed above, Calvert's bodycam shows Benfer repeatedly breaking free of Calvert's grasp and refusing to comply with Calvert's commands. That video indisputably showed Benfer "preventing a peace officer from effecting an arrest by using force." Tex. Pen. Code § 38.03(a) (cleaned up). Thus, there was probable cause to institute criminal proceedings against Benfer for resisting arrest.

Therefore, Benfer has not pleaded that Calvert violated his constitutional rights by instituting criminal process against him for resisting arrest. The district court correctly dismissed that claim.

## D.

Benfer avers that Calvert's use of his K-9 constituted excessive force in violation of the Fourth and Fourteenth Amendments. Specifically, Benfer claims that Calvert violated his clearly established rights by (1) releasing the dog and (2) allowing the dog to bite him until he was handcuffed. The district court found that Calvert's release and use of his K-9 did not violate Benfer's clearly established rights. We agree.

"To establish a Fourth Amendment violation in this context," Benfer "must establish (1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was

---

[8] *Hughes v. Garcia*, 100 F.4th 611, 619 (5th Cir. 2024) (quoting *Thompson v. Clark*, 596 U.S. 36, 43 (2022)).

clearly unreasonable." *Ratliff v. Aransas Cnty.*, 948 F.3d 281, 287 (5th Cir. 2020) (cleaned up). Calvert's K-9 undisputedly bit Benfer, so only the second and third prongs are at issue here: Benfer must plausibly allege that Calvert's release and use of his dog was a "clearly excessive" use of force that was "clearly unreasonable."

Claims of excessive force in "seizing" a suspect are governed by an objective standard of reasonableness focusing on the facts of a particular case. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). When reviewing 'the totality of the circumstances,' "we pay particular attention to the *Graham* factors, i.e. 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"[9] And we must always judge the force used "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Escobar*, 895 F.3d at 394.

### 1.    *Calvert's decision to release his K-9 was a constitutional use of force.*

An officer did not use excessive force when he released a K-9 on a suspect who "ignored [the officer's] instructions, and retreated further under [a] home, preventing [the officer] from determining whether he was armed." *Shumpert v. City of Tupelo*, 905 F.3d 310, 323 (5th Cir. 2018). In contrast, releasing a dog violates the Fourth Amendment where there are no "attempts to subdue [the suspect] without the use of a dog bite, [or to] provid[e] [the suspect] any warning," and where the suspect "was not suspected of any crime; did not pose an immediate safety threat to officers or others; and was in need of emergency medical intervention due to self-harm and was

---

[9] *Escobar*, 895 F.3d at 394 (quoting *Darden v. City of Fort Worth*, 880 F.3d 722, 728-29 (5th Cir. 2018)).

not attempting to flee the officers." *Sligh v. City of Conroe*, 87 F.4th 290, 299 (5th Cir. 2023) (per curiam) (cleaned up).[10]

Benfer repeatedly resisted arrest and walked away from Calvert. Benfer ignored Calvert's warning that he had a dog who would bite Benfer if he continued to resist. Importantly, Calvert deployed the dog only after Mrs. Benfer made physical contact with him while he was trying to restrain Benfer.

Calvert was outnumbered. He faced one individual who had resisted his many attempts to use lesser force and another who made aggressive contact with him—near his gun belt—while he attempted to restrain the first. From the perspective of a reasonable officer on the scene, Calvert's use of a K-9 to subdue Benfer while he dealt with Mrs. Benfer was a measured and ascending use of reasonable force. *See Shumpert*, 905 F.3d 323.

Therefore, Calvert's decision to release his K-9 was not clearly excessive under the circumstances, and Benfer has not plausibly alleged that that decision violated his right to be free from excessive force.

2.    *Calvert's use of the K-9 to subdue Benfer until he was handcuffed was a constitutional use of force.*

Our court first addressed the reasonableness of using a police dog to subdue a suspect in *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016). There, an officer pulled Cooper over on suspicion of driving under the influence. *Id.* at 521. After failing a breath test, Cooper fled on foot into a residential neighborhood. *Id.* The initial officer then alerted other officers in the area to Cooper's flight, including Brown and his K-9, Sunny. *Id.* Despite having no reason to believe that Cooper had a weapon, Brown deployed Sunny to search

---

[10] *Sligh* post-dated the events here and is relevant *only* to the existence of a constitutional violation, not whether that violation was clearly established.

for him. *Id.* Shortly thereafter, Sunny found Cooper and bit him on the leg "for one to two minutes." *Id.* Brown did not order Sunny to release until after handcuffing Cooper. *Id.* Applying the *Graham* factors, we held that "[u]nder the facts in th[e] record, permitting a dog to continue biting a compliant and non-threatening arrestee is objectively unreasonable." *Id.* at 524.

Years later, in *Escobar*, our court again addressed the reasonableness of using a police dog to subdue a suspect. But this time, in contrast with *Cooper*, we held that it was "objectively reasonable to permit [a K-9] to continue biting Escobar until he was fully handcuffed and subdued," despite that he laid flat on the ground, his hands were visible, and he was compliant with the officer's commands. *Escobar*, 895 F.3d at 394. Why? Because the officer "had reason to believe he still posed a threat." *Id.* at 395. "The chase was at night; Escobar had hidden from the police for twenty minutes[;]" Escobar's mother had warned the police that he "would not go without a fight; and [a] knife remained within Escobar's reach . . . ." *Id.* at 394. Thus, the officer had "reason to doubt [Escobar's] compliance" and that his "surrender was not genuine." *Id.* at 395. Applying the *Graham* factors, we held that "it was objectively reasonable to permit [the K-9] to continue biting Escobar until he was fully handcuffed and subdued." *Id.* at 396.

Because, under the totality of the circumstances, Benfer posed an objective threat to Calvert, the *Graham* factors favor a finding that Calvert's use of his K-9 was objectively reasonable:

The first factor—the severity of the offense—favors Calvert. "[I]nterfering with the duties of a public servant[,]" such as resisting arrest, is a serious offense. *Brothers v. Zoss*, 837 F.3d 513, 519 (5th Cir. 2016). Here, Calvert's bodycam shows Benfer repeatedly breaking free of Calvert's grasp and refusing to comply with Calvert's commands—simply put, Benfer was resisting arrest.

The second factor—whether Benfer posed a threat—is a closer call, but it ultimately favors Calvert. Benfer had disobeyed several of Calvert's commands and resisted arrest. Calvert was outnumbered. Mrs. Benfer, only moments earlier, had made aggressive contact with Calvert—near his gun belt—while he was struggling with Benfer, and although handcuffed, she remained in the general vicinity. The arrest took place on a rainy night. *Cf. Escobar*, 895 F.3d at 394. And there was no indication that Benfer would comply with Calvert's instructions if Calvert released the K-9. Though Benfer did not appear to be armed, in the face of such facts, a reasonable police officer would have had reason to doubt Benfer's compliance and conclude that he posed a threat.

Benfer disagrees that he posed a threat and that our analysis of his case should begin and end with *Cooper*. In his telling, he was "compliant and non-threatening" by the time Calvert went to handcuff him. And because his behavior matched Cooper's, "permitting a police dog to continue biting [him] is objectively unreasonable." *See Cooper*, 844 F.3d at 524. But we see several distinctions between Benfer's and Cooper's behaviors: Calvert had repeatedly "attempt[ed] to negotiate" with Benfer before calling his K-9 to assist. *Contra id.* at 523. Calvert was outnumbered, and Mrs. Benfer had made aggressive contact with Calvert while he struggled to arrest Benfer. And Benfer and his wife escalated the situation by repeatedly disobeying Calvert's commands and resisting arrest. Under those circumstances, a reasonable officer could conclude that Benfer's surrender was not genuine and that Benfer posed a threat.

And, finally, we have already determined that Benfer resisted arrest, so the third *Graham* factor—whether Benfer was resisting or attempting to flee—favors Calvert.

Even if Benfer had demonstrated that he posed no objective or subjective threat to Calvert or that he would not resist arrest or flee if the K-9 was released, Calvert attempted to release the K-9's grip on Benfer *before* finishing handcuffing him. Thus, unlike in *Cooper*, where "Brown *permitted* the attack to continue for one to two minutes," *Id.* at 524 n.6 (emphasis added), Calvert did not permit the K-9 to continue biting Benfer. Calvert attempted to cease the use of force, albeit unsuccessfully.

Based on all the circumstances, Calvert's use of his K-9 to subdue Benfer until he was handcuffed was an objectively reasonable use of force that was not clearly excessive under the circumstances, and Benfer has not plausibly alleged that Calvert's decision violated his right to be free from excessive force. So, the district court was correct to dismiss his claim.

## E.

In addition to his claims under § 1983, Benfer sued Calvert for assault under Texas tort law. The district court dismissed that claim, finding that Calvert was statutorily immune under Texas law. The district court was correct.

The Texas Tort Claims Act (TTCA) "provides a limited waiver of immunity for certain tort claims against the government." *Tex. Adjutant Gen.'s Off. v. Ngakoue*, 408 S.W.3d 350, 354 (Tex. 2013). Under the TTCA, "recovery against an individual employee is barred" but it "may be sought against the governmental unit only in three instances: . . . (3) when suit is filed against an employee whose conduct was within the scope of his or her employment and the suit could have been brought against the governmental unit." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008). The TTCA allows municipalities to be held liable "for damages arising from . . . police and fire protection and control." Tex. Civ. Prac. & Rem. Code § 101.0215(a)(1).

That all means a plaintiff seeking to sue a police officer for conduct undertaken within the scope of that officer's employment must sue the municipality, not the officer individually. *Alexander v. Walker*, 435 S.W.3d 789, 792 (Tex. 2014) (per curiam).

"The TTCA defines the term 'scope of employment' as 'the performance for a governmental unit of the duties of an employee's office or employment. . . .'" *Id.* (quoting TEX. CIV. PRAC. & REM. CODE § 101.001(5)). And a police officer's "conduct in the course of arresting" a suspect is "within the general scope of the officers' employment." *Id.*

Benfer's assault claim stems from actions Calvert took when arresting Benfer. Thus, Benfer has sued Calvert for conduct well within the scope of his employment. And that claim could have been brought against the City of Baytown because the TTCA explicitly allows cities to be held liable for damages "arising from . . . police" activities. TEX. CIV. PRAC. & REM. CODE § 101.0215(a)(1). Therefore, Benfer had to bring his tort claim against the City of Baytown, not Calvert individually.

Benfer resists that conclusion by noting, correctly, that the TTCA does not apply to a claim "arising out of assault . . . or any other intentional tort . . . ." TEX. CIV. PRAC. & REM. CODE § 101.057(2). Benfer has a point: The text of § 101.057(2) appears to prevent a governmental entity from being held liable for the intentional torts of its employees. If the governmental entity cannot be held liable, then the TTCA allows an employee to be sued individually, even if they were acting within the scope of their employment. *See Garcia*, 253 S.W.3d at 657.

The Texas Supreme Court, however, rejected that argument in *Walker*. There, as here, "Walker brought suit . . . alleging assault . . . stemm[ing] from the officers' conduct incident to Walker's arrest . . . ." 435 S.W.3d at 790. Still, the court held that "[t]he allegations in Walker's petition . . .

[were] based on conduct within the general scope of the officer's employment" and "could have been brought under the TTCA against the government." *Id.* at 792 (citations omitted).

We are bound to apply Texas law as construed by the Texas Supreme Court, so we affirm the dismissal of Benfer's assault claim against Calvert as indistinguishable from *Walker*. Because Benfer did not amend his complaint and bring his claim against the City, the district court was correct to dismiss the claim.[11]

## F.

Benfer also sued the City under § 1983, averring that it (1) had inadequate written policies concerning the use of police dogs; (2) had a pattern and/or custom of using police dogs to inflict injuries on non-threatening suspects; (3) failed to train its officer's adequately in the use of police dogs; and (4) ratified Calvert's conduct. The district court dismissed those claims, finding that Benfer had failed to identify a particular policy, failed to show sufficiently numerous instances of K-9 encounters to establish a custom, and failed to support its other claims with anything more than "conclusory allegations." We agree.

1. *Benfer failed to plead sufficient facts to support his claim that the City of Baytown had an unconstitutional policy or custom concerning police dogs.*

A municipality may be liable under § 1983 if the execution of one of its

---

[11] When the TTCA requires the plaintiff to sue the governmental entity, "the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed." Tex. Civ. Prac. & Rem. Code § 101.106(f).

customs or policies causes the deprivation of a constitutional right.[12]  "To establish municipal liability, a plaintiff must show '(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom).'" *Newbury v. City of Windcrest*, 991 F.3d 672, 680 (5th Cir. 2021) (quoting *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002)).

At the motion-to-dismiss stage, a plaintiff need not "allege the specific identity of the policymaker," but must "allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable." *Groden v. City of Dall.*, 826 F.3d 280, 283–84 (5th Cir. 2016) (emphasis omitted).  Benfer has failed to do so.  His amended complaint does not identify anything that could be considered an official policy of the City of Baytown.  Benfer's *Monell* claim premised on an unconstitutional policy must fail when he cannot even articulate what official policy Baytown has adopted governing police dogs.

A municipality, however, may still be liable under § 1983 in the absence of an official policy if there is an employee practice that is so widespread and common that it constitutes a custom representing the policies of the municipality. *See Piotrowski v. City of Hous.*, 237 F.3d 567, 581 (5th Cir. 2001).

A plaintiff proves the existence of a custom by showing "a pattern of abuses that transcends the error made in a single case." *Id.* at 582.  "A successful showing of such a pattern requires similarity and specificity; prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question." *Hicks-Fields v. Harris Cnty.*,

_____

[12] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

860 F.3d 803, 810 (5th Cir. 2017) (cleaned up). "In addition to similarity and specificity, a pattern must be comprised of 'sufficiently numerous prior incidents' rather than merely 'isolated instances.'"[13] "Showing a pervasive pattern is a heavy burden." *Sanchez v. Young Cnty.*, 956 F.3d 785, 793 (5th Cir. 2020) (citation omitted).

Benfer's amended complaint identifies five instances of Baytown police allegedly using dogs to apprehend suspects impermissibly. But Benfer fails to provide the needed factual context for four of those incidents—his threadbare complaint notes only the existence of K-9 encounters that resulted in bites. He does not detail the facts surrounding those encounters or make any attempt to show the needed "similarity and specificity" between events. *See Hicks-Fields*, 860 F.3d at 810.

Those five instances also occurred over the span of four years (2019–2022). Five incidents of excessive force over four years in a city as large as Baytown[14] is not enough to meet the heavy burden of showing that Baytown had a custom of allowing officers to use police dogs unconstitutionally. *Cf. Davidson v. City of Stafford*, 848 F.3d 384, 396–97 (5th Cir. 2017) (noting that three incidents over three-and-a-half years were insufficient to establish a pattern of constitutional violations).

Therefore, the district court did not err in finding that Benfer had failed plausibly to allege that the City of Baytown had inadequate written policies concerning the use of police dogs or had a pattern/custom of using police dogs to inflict injuries on non-threatening suspects.

_____

[13] *Fuentes v. Nueces Cnty.*, 689 F. App'x 775, 778 (5th Cir. 2017) (per curiam) (quoting *McConney v. City of Hous.*, 863 F.2d 1180, 1184 (5th Cir. 1989)).

[14] Baytown had a population of 83,701 according to the 2020 census.

2. *Benfer failed to plead sufficient facts to support his claim that the City of Baytown failed to train its officers on the proper use of police dogs.*

"A municipality's failure to train its police officers can without question give rise to § 1983 liability." *Edwards v. City of Balch Springs*, 70 F.4th 302, 312 (5th Cir. 2023) (cleaned up). To succeed, the plaintiff must show "(1) the city failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Id.* (internal quotation marks and citation omitted).

Benfer's complaint falters on that first requirement. "In order for liability to attach based on an inadequate training claim, a plaintiff must allege with specificity how a particular training program is defective." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010) (internal quotation marks and citation omitted). Benfer alleged only that the City of Baytown failed to retrain Calvert after his involvement in a previous K-9 incident. He made no attempt to identify a specific training program, point out particular deficiencies in that program, or explain why any lack of a formalized training program was constitutionally problematic. Benfer has merely "styl[ed] [his] complaint[] about the specific injury suffered as a failure to train claim." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005).

Thus, the district court did not err in finding that Benfer had failed to allege plausibly that the City of Baytown was liable under a "failure-to-train" theory.

3. *Benfer has failed to plead sufficient facts to support his claim that the City of Baytown ratified Calvert's conduct.*

Ratification "provides another way of holding a city liable under § 1983." *Allen v. Hays*, 65 F.4th 736, 749 (5th Cir. 2023). "[R]atification can

suffice for *Monell* liability only if the authorized policymakers approve a subordinate's decision *and the basis for it*." *Id.* at 749 n.10 (internal quotation marks and citation omitted).

Benfer's complaint averred that "[t]he City of Baytown condoned and ratified the actions of Calvert by failing to discipline or retrain him." But ratification requires the approval of a policy maker, not their mere acquiescence, and Benfer has failed to allege any facts even suggesting that any authorized policymaker approved of Calvert's actions. Nor does he provide any support for his apparently novel tactic of merging his failure-to-train claim with his ratification claim. The district court did not err in dismissing Benfer's ratification claim against the City of Baytown.

\* \* \* \*

For the foregoing reasons, the judgment of dismissal is AFFIRMED.