# United States Court of Appeals
# for the Fifth Circuit

_____

No. 24-10518

_____

Cara Wessels Wells,

Plaintiff—Appellant,

*versus*

Texas Tech University; Samuel Prien; Lindsay Penrose,

Defendants—Appellees.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 5:23-CV-60

_____

United States Court of Appeals
Fifth Circuit

**FILED**

March 3, 2025

Lyle W. Cayce
Clerk

Before King, Ho, and Ramirez, *Circuit Judges*.

Per Curiam:[*]

Cara Wells, an unpaid mentor who was removed from a university-sponsored program, appeals the dismissal of her lawsuit against Texas Tech University (TTU) and two professors. We AFFIRM.

I

After Wells enrolled in TTU in 2009, she became interested in animal science research and began working as a research assistant for Samuel Prien,

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

a professor in the Department of Animal and Food Sciences. Wells attended various conferences with Prien and another professor who worked in his lab, Lindsay Penrose. She contends Prien forced her to share a hotel room with him and Penrose during the conferences, and that the professors consistently harassed and bullied her. After she graduated, Wells continued working in Prien's lab as a Ph.D. student.

In 2014, TTU began filing applications to patent ideas and methods developed by Wells and the professors, including her "original concept for using embryo buoyancy to determine embryo sex." Even though the patent application initially listed Wells, Prien, and Penrose as co-inventors, TTU removed Wells as an inventor before the patent was awarded. Wells's portion of royalties for another patent was disproportionately lower than that of the professors, and she has not received royalties from TTU for several other patents.

Wells graduated from the doctoral program in 2017, but she struggled to find work. Prien, whom she had listed as a reference, informed her that he had "told [potential employers] that he could not recommend her for the job," allegedly "so that she would have no choice but to return to an assistant's position in his lab."

Wells eventually applied for and was accepted to TTU's Accelerator Hub program, a year-long initiative that offers funding, training, and business support to startups, and she added Prien to her team of mentors in the program. Wells and her company, Embroytics, partnered with another company, Simplot, to conduct research, for which they entered into a ten-year non-disclosure agreement. Prien, like all other mentors in the Hub program, also entered into a non-disclosure agreement.

After Embryotics dissolved, Wells founded EmGenisys—a company focused on a digital, noninvasive embryo assessment platform for livestock,

and she again applied and was accepted into the Hub program. A precision livestock company called Vytelle approached EmGenisys in 2019, to collaborate on a "project that would build upon the technology" that Embryotics had been working on before its dissolution. Because that technology had been developed at TTU, Wells needed to secure a license from the university, and Wells had repeatedly sought assurance from TTU that she would be able to license the technology but received none. TTU ultimately licensed the technology directly to Vytelle and arranged for EmGenisys and Wells to work for Vytelle, which "robbed" her of a "lucrative financial opportunity." Prien and Penrose allegedly drove this arrangement.

EmGenisys remained in the Hub program, and Wells continued to include Prien in her research. He asked to view data from a "sex selection study" she had performed for Simplot and then used it as part of an abstract for a presentation at a conference. Wells asked him to withdraw his submission because she worried that the presentation would harm her companies, breach Embryotic's non-disclosure agreement with Simplot, and violate Prien's non-disclosure agreement for the Hub program, but he refused. After the conference removed the abstract based on Wells's claim of "misconduct and misappropriation," Prien allegedly told another graduate student that he was going to "destroy" her.

Wells subsequently discussed the professors' alleged misconduct, including being forced to share a room with them, with a TTU student body representative, the managing director of the TTU Innovation Hub, and another mentor in the Hub program. In the fall of 2020, she also raised the issue with the Vice Provost for Graduate and Postdoctoral Affairs and Dean of the Graduate School during a virtual lunch discussion about how TTU could better serve its students. Wells followed up in writing, but the dean did not respond for more than a year.

In May 2022, Wells returned to the Hub program as a mentor. The selection process for mentors included interviews, background checks, and onboarding procedures. Those who are selected were added to TTU's website. Wells alleges that it was common practice for Hub program mentors to turn their roles into compensated ones by being hired in full-time roles at TTU or partnering with companies accepted into the Hub program. About a month later, the Office of the General Counsel removed Wells from her mentoring position. TTU removed her from its website and eliminated her from its publications. Wells claims that Hub program mentors were instructed to terminate formal relationships with her and forego future programming with her. "No legitimate reason was given for removing [her]."

On November 11, 2022, Wells filed a charge with the Equal Employment Opportunity Commission (EEOC) against TTU alleging discrimination, harassment, and retaliation based on sex. She alleged that Prien subjected her to harassment and discrimination from 2012, when she was an undergraduate research assistant, through June 2022, when she was removed as a Hub mentor, and that TTU ignored and disregarded her allegations about his conduct. She also claimed that Prien and TTU retaliated against her for complaining about sharing a hotel room with him during conference trips when TTU eliminated her inventor listings from its publications, removed her as a mentor, and instructed a "third party" to not work with her. The EEOC issued a Right to Sue letter on December 22, 2022.

On March 22, 2023, Wells sued TTU, Prien, and Penrose, asserting claims under Title VII of the Civil Rights Act of 1964, Title IX of the

No. 24-10518

Education Act of Education Amendment of 1972, and state law.[1] Wells appeals the dismissal of her claims as well as the denial of her motion for leave to amend her complaint a second time.

## II

We review the grant of a motion to dismiss under Rule 12(b)(6) *de novo*. *Lindsay v. United States*, 4 F.4th 292, 294 (5th Cir. 2021). We "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiffs." *Id.* (quoting *Anderson v. Valdez*, 845 F.3d 580, 589 (5th Cir. 2016)). To survive a motion to dismiss, a complaint must contain sufficient facts to state a claim for relief that is plausible on its face. *In re Ondova Ltd. Co.*, 914 F.3d 990, 992–93 (5th Cir. 2019) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "And while we must accept a plaintiff's factual allegations as true, we are not bound to accept as true 'a legal conclusion couched as a factual allegation.'" *Id.* at 993 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

## III

Wells argues that the district court erred in dismissing her Title VII claims.[2]

---

[1] Wells also asserted claims against both professors for Equal Protection violations under 42 U.S.C. § 1983, Title IX discrimination, correction of inventorship, patent invalidity, intentional infliction of emotional distress, and fraudulent concealment, and a claim against Prien for defamation per se. On appeal, she does not challenge the dismissal of those claims.

[2] The amended complaint alleges three separate Title VII claims against TTU, which the district court characterized as sexual harassment, hostile work environment, and retaliation claims. Although sexual harassment and hostile work environment may constitute distinct claims, *Hague v. Univ. of Texas Health Sci. Ctr. at San Antonio*, 560 F. App'x 328, 331 (5th Cir. 2014), the district court considered them collectively. Neither party disputes this characterization or consideration of the claims.

Title VII makes it illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2. "[A] discriminatory and hostile work environment—when sufficiently severe or pervasive—can rise to the level of altering the terms, conditions, or privileges of employment for Title VII purposes." *Hamilton v. Dallas County*, 79 F.4th 494, 503 (5th Cir. 2023) (en banc) (citing cases); *see also Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 440 (5th Cir. 2011) ("Title VII has long been a vehicle by which employees may remedy discrimination they believe creates a hostile work environment."). This includes sexual harassment that takes the form of a hostile or abusive working environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). "Title VII also prevents retaliation by 'forbid[ding] employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing.'" *Johnson v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, 90 F.4th 449, 455 (5th Cir. 2024) (citations omitted); *see* 42 U.S.C. § 2000e–3(a).

"Before seeking relief in federal court, Title VII plaintiffs must exhaust their administrative remedies." *Stroy v. Gibson ex rel. Dep't of Veteran Affs.*, 896 F.3d 693, 698 (5th Cir. 2018) (citing *Davis v. Fort Bend County*, 893 F.3d 300, 303 (5th Cir. 2018)). Although administrative exhaustion under Title VII is not "a jurisdictional requirement," it is "a precondition to filing suit, subject to waiver or estoppel defenses." *Id.* "Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002). A Title VII plaintiff must ordinarily file a charge of discrimination within 180 days from the date of the unlawful employment practice. *See* 42

No. 24-10518

U.S.C. § 2000e–5(e)(1). "In a state that, like Texas, provides a state or local administrative mechanism to address complaints of employment discrimination, a [T]itle VII plaintiff must file a charge of discrimination with the EEOC within 300 days after learning of the conduct alleged." *Huckabay v. Moore*, 142 F.3d 233, 238 (5th Cir. 1998) (citing *id.*).[3]

A

Wells argues that the district court erred in dismissing her sexual harassment and retaliation claims as untimely based on its finding that she was last employed by TTU in 2017, well over 300 days before she filed her EEO charge in November 2022. She claims she was employed by TTU as an unpaid mentor in the Hub program in 2022.

We apply the "threshold-remuneration test" to decide whether an unpaid person is an "employee" within the meaning of Title VII. *Juino v. Livingston Par. Fire Dist. No. 5*, 717 F.3d 431, 439 (5th Cir. 2013). Generally, an employee must receive direct remuneration (i.e., salary or wages) or significant indirect benefits that are not incidental to the service performed for the putative employer (i.e., job-related benefits). *Id.* at 438–39. Without a financial benefit, "no 'plausible' employment relationship of any sort can be said to exist." *Id.* at 439 (quoting *O'Connor v. Davis*, 126 F.3d 112, 115–16 (2d. Cir. 1997)).

Here, Wells does not allege that TTU paid her a salary or provided any other financial benefits participating in the Hub program. *See id.* at 439. Although she claims that she "underwent rigorous interviews, background checks and onboarding procedures" and was "added to the TTU website,"

---

[3] We have held that the 300–day filing period applies "whether or not these other proceedings were timely instituted under state or local law." *Urrutia v. Valero Energy Corp.*, 841 F.2d 123, 125 (5th Cir. 1988).

and that it was "common practice" for Hub mentors to transform their roles into full-time roles at TTU or partnerships with Hub companies, these benefits are "purely incidental to her volunteer service." *See Juino*, 717 F.3d at 440 (holding that an unpaid firefighter was not an employee under Title VII because the benefits she received—a life insurance policy, a uniform and badge, and training—were "purely incidental to her volunteer service") (citation omitted); *see also Sacchi v. IHC Health Servs., Inc.*, 918 F.3d 1155, 1159 (10th Cir. 2019) (noting that "others . . . obtain[ing] positions after unpaid internships does not constitute a substantial or significant indirect benefit").

Because Wells was not an "employee" for purposes of Title VII while acting as a mentor for the Hub program in 2022, the district court did not err in finding her Title VII claims untimely.

B

Wells contends that even if she was only employed until 2017, her retaliation claims are not time-barred because she engaged in protected activity during "fall 2020," and her EEO charge alleged acts of retaliation against her "occurring on January 15, 2022 or later."

Although former employees may pursue retaliation claims against former employers, this principle is not designed to permit a perpetual cause of action for any unfavorable action taken in the future. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 339 (1997). It is instead designed to ensure that employees who are discharged in retaliation for their complaints can bring claims even though they are no longer a current employee. *Id.* "The ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a 'but for' cause of the adverse employment decision." *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996) (citing *McDaniel v. Temple Indep. Sch. Dist.*, 770 F.2d 1340, 1346 (5th Cir. 1985)). A

former employee fails to allege Title VII retaliation when she is sufficiently removed from the employment relationship because the connection between the harm and the protected act becomes too attenuated. *Compare Robinson*, 519 U.S. at 339 (finding actionable plaintiff's claim that he received a negative reference from his former employer shortly after his termination and filing of an EEO charge), *with Allen v. Radio One of Tex. II, L.L.C.*, 515 F. App'x 295, 302 (5th Cir. 2013) (rejecting claim that nearly a year after plaintiff engaged in protected activity and 18 months after she was fired, plaintiff's former employer refused to do business with her new company).

Here, Wells alleged that she was removed from the mentor program, deleted from TTU's website, and blacklisted from the TTU community in June 2022 in retaliation for reporting professors' misconduct in the fall of 2020. Even if her statements during the fall 2020 virtual lunch constitute protected activity, retaliatory conduct that occurred in January 2022, or later, is too attenuated from her last employment in 2017.

IV

Wells also argues that the district court erred in dismissing her Title IX claims as untimely and for failure to state a claim.

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). It imposes liability only against an institution—not school officials, professors, or other individuals. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).

Title IX is governed by state statutes of limitations for personal injury actions. *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 759 (5th Cir. 2015). In Texas, the relevant limitations period is two years. *See* Tex. Civ. Prac. & Rem. Code § 16.003; *King-White*, 803 F.3d at 761 (5th Cir. 2015)

No. 24-10518

(applying Texas law to Title IX claim). Generally, a Title IX claim "accrues when the plaintiff knows or has reason to know of the injury giving rise to the claim." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 583 (5th Cir. 2020).

## A

Wells argues that her "many" claims outside the two-year period are not time-barred based on the "continuing violations" doctrine because "she only later became aware of certain of the harmful misconduct that occurred during and after her tenure at TTU."

Under the continuing violation doctrine, if at least one action in a series of related misconduct falls within the limitations period, all related actions will be considered timely. *Berry v. Bd. of Sup'rs of LSU*, 715 F.2d 971, 979 (5th Cir. 1983). But a violation is not continuing if there are intervening actions that "sever the acts that preceded it from those subsequent to it, precluding liability for preceding acts outside the filing window." *Stewart v. Mississippi Transp. Com'n*, 586 F.3d 321, 328 (5th Cir. 2009).[4]

Because Wells's 2017 graduation from TTU and the 2019 dissolution of her first company that had ties with TTU are sufficient intervening actions, the district court did not err in finding her pre-2019 Title IX claims untimely.

## B

Wells argues that she has alleged a plausible claim for relief for her remaining claims.

---

[4] The continuing violation doctrine is primarily associated with Title VII harassment claims, and Title IX cases routinely rely on Title VII caselaw. *Sewell*, 974 F.3d at 584 n.2; *see also Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) (stating that Title IX is governed by Title VII jurisprudence).

No. 24-10518

To establish a Title IX claim for employee-on-student harassment, a plaintiff must allege that (1) a person authorized to address the harassment had actual notice of the behavior; and (2) even with this notice, the program's response to the harassment amounted to "deliberate indifference." *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358–59 (5th Cir. 2020). "The deliberate indifference standard is a high one." *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000) (quoting *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998)).

Wells has not alleged sufficient facts to support either of these two prongs. Her statements to the dean focused on hotel accommodations and cost-sharing. *Edgewood Indep. Sch. Dist.*, 964 F.3d at 358–59. She also did not allege facts to show the dean was a person who could address the harassment. *Id.* Although Wells argues that she did not need to provide notice because her claims were being perpetuated by "high ranking individuals," notice is required unless an official sex-based discrimination policy is alleged, which it is not. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). And Wells has alleged no facts rising to the level of "deliberate indifference," which is a "high one" to meet. *Dallas Indep. Sch. Dist.*, 220 F.3d at 384.

The district court did not err in dismissing Wells's Title IX claims.[5]

---

[5] On appeal, Wells argues that she pleaded sufficient facts to support a claim for retaliation under Title IX based on TTU's failure to investigate her complaints about having to share hotel rooms with her professors and subsequent adverse actions. Wells did not expressly assert a Title IX retaliation claim in her original or amended complaints or her response to TTU's motion to dismiss. Even if she "adequately pleaded each element of the claim," *Barron v. United States*, 111 F.4th 667, 673 (5th Cir. 2024), it is barred by the two-year statute of limitations. *See King-White*, 803 F.3d at 759–60.

No. 24-10518

V

Wells argues that the district court erred in dismissing her state law claims for unjust enrichment, breach of fiduciary duty, trade secret misappropriation, and tortious interference with contractual relations under the Texas Tort Claims Act ("TTCA") because the professors' conduct was not "within the scope of their employment."[6]

"The TTCA bars tort claims against government employees when (1) the alleged tort occurred 'within the general scope of that employee's employment' and (2) 'it could have been brought under [the TTCA] against the governmental unit.'" *Espinal v. City of Houston*, 96 F.4th 741, 749 (5th Cir. 2024) (quoting Tex. Civ. Prac. & Rem. Code § 101.106(f)). "The TTCA defines the term 'scope of employment' as 'the performance for a governmental unit of the duties of an employee's office or employment and includes being in or about the performance of a task lawfully assigned to an employee by competent authority.'" *Alexander v. Walker*, 435 S.W.3d 789, 792 (Tex. 2014) (quoting Tex. Civ. Prac. & Rem. Code § 101.001(5)). To prevail on the scope-of-employment inquiry, a defendant need only link one's "job responsibilities to the alleged torts." *Smith v. Heap*, 31 F.4th 905, 913 (5th Cir. 2022) (citing *Garza v. Harrison*, 574 S.W.3d 389, 394 (Tex. 2019)) (cleaned up). The alleged misconduct must have "nothing to do with

---

[6] The professors moved to dismiss under Rules 12(b)(1) and 12(b)(6), but their motion did not identify the basis for dismissing the state law claims under the TTCA. The district court's opinion does not mention Rule 12(b)(1) and appears to dismiss all claims under Rule 12(b)(6). We have affirmed dismissals of state law claims under the TTCA raised in motions to dismiss under both Rule 12(b)(1) and Rule 12(b)(6). *See Espinal v. City of Houston*, 96 F.4th 741, 749 (5th Cir. 2024) (affirming dismissal of state law claims barred by TTCA for failure to state a claim under 12(b)(6)); *Benfer v. City of Baytown*, 120 F.4th 1272, 1285 (5th Cir. 2024) (same); *Smith v. Heap*, 31 F.4th 905, 913 (5th Cir. 2022) (same); *Huang v. Huang*, 846 F. App'x 224, 230 (5th Cir. 2021) (affirming dismissal of state law claims barred by TTCA for lack of jurisdiction under 12(b)(1)).

the employees' duties." *Wilkerson*, 878 F.3d at 160. This is an objective analysis, *see Laverie v. Wetherbe*, 517 S.W.3d 748, 752–53 (Tex. 2017), meaning a plaintiff cannot bypass the immunity issue by merely alleging a defendant was acting outside the scope of his authority. *See Heap*, 31 F.4th at 914.

Wells's unjust enrichment and breach of fiduciary duty claims arise from the various patents filed by TTU. The professors' conversations and actions that allegedly caused her financial and reputational loss are linked to research conducted on behalf of the university, a key job responsibility of the professors. *See Ho v. Univ. of Tex. at Arlington*, 984 S.W.2d 672, 688–89 (Tex. App.—Amarillo 1998, pet. denied) (finding professors had established their immunity defense because they were acting within the scope of their employment by "teaching, evaluating, and researching").[7] The patents were filed by TTU, so any discussions or actions taken regarding the patents concern the professors' scope of employment, regardless of whether they continue to receive royalties after they are no longer employed with TTU. *See Wilkerson*, 878 F.3d at 160 (recognizing that a connection between employee's job duties and alleged misconduct may exist "even if the employee performs negligently or is motivated by ulterior motives or personal animus") (citation omitted).

Wells's trade secret misappropriation and tortious interference claims concern Prien's submission of data from the "sex selection study" she performed for Simplot. She alleges that this conduct is outside the scope of his authority as a TTU professor and a Hub program mentor. Because he

---

[7] Although *Ho* concerned an official immunity defense, that analysis is "nearly identical" to the "scope of employment" analysis under the TTCA. *Wilkerson*, 878 F.3d at 160 n.14 ("The 'scope of . . . authority' under official immunity is nearly identical with 'scope of employment' under the Texas Tort Claims Act.") (citations omitted).

No. 24-10518

gained access to the data through the mentorship program, this conduct is sufficiently linked to his job responsibilities. *See Heap*, 31 F.4th at 913.

Wells argues that under Texas law, "intentional torts 'perpetrated by an employee'" are not within the course and scope of an employee's authority or employment. Intentional torts generally can be within the scope of one's employment so long as the act is not a deviation from one's job duties. *Fink v. Anderson*, 477 S.W.3d 460, 467–69 (Tex. App—Houston [1st Dist.] 2015, no pet.) (rejecting the argument that an intentional tort forecloses a finding that an employee was acting within the scope of his employment and citing examples under Texas law).

Because the professors were acting within the scope of their employment at all relevant times, the district did not err by dismissing Wells's tort claims for unjust enrichment, breach of fiduciary duty, trade secret misappropriation, and tortious interference with contractual relations as barred by § 101.106(f).[8]

## VI

Wells argues that the district court erred in dismissing her trade secret misappropriation claim against Prien because the data from the "sex selection study" constituted a trade secret, she communicated it to Prien under a non-disclosure agreement, and he used it in violation of the agreement.

---

[8] Because we affirm on this basis, we need not reach Wells's argument that her state law claims were improperly dismissed under § 101.106(e). *See Forgan v. Howard County*, 494 F.3d 518, 521 n.3 (5th Cir. 2007).

No. 24-10518

To state a claim under the Texas Uniform Trade Secrets Act ("TUTSA"),[9] a plaintiff must allege that "(1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant used the trade secret without authorization from the plaintiff." *CAE Integrated, LLC v. Moov Techs., Inc.*, 44 F.4th 257, 262 (5th Cir. 2022) (emphasis omitted) (quoting *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 325 (5th Cir. 2018)); Tex. Civ. Prac. & Rem. Code § 134.002(3).

As to the first element, Wells alleges that the "data from her research as part of Embryotics and EmGenisys constituted a trade secret." A "trade secret is information which derives independent economic value from being not generally known or readily ascertainable through proper means." *CAE Integrated, LLC*, 44 F.4th at 262. Texas courts weigh six factors to determine the existence of a trade secret:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*GlobeRanger Corp. v. Software AG U.S. of Am., Inc.*, 836 F.3d 477, 492 (5th Cir. 2016) (citing *In re Union Pac. R.R. Co.*, 294 S.W.3d 589, 592 (Tex. 2009)).

_____

[9] Wells's amended complaint does not indicate the basis for her claim, but the district court considered it under the TUTSA because it "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret."

No. 24-10518

Wells has not alleged sufficient facts showing that the "sex selection study" is a trade secret. Texas law does not require a specific description of the trade secret, but it requires more specificity than what Wells alleges in her amended complaint. *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 875–76 (5th Cir. 2013) (holding that "Wellogix presented sufficient evidence and testimony to support the jury's finding that Wellogix's technology contained trade secrets" without requiring a specific description of the trade secret). Wells does not allege the extent to which the data is "known by employees and others involved in the business" or the "value of that information to the business and its competitors." *Id.* at 875 (quoting *In re Bass*, 113 S.W.3d 735, 739–40 (Tex. 2003)). There are no allegations about "the amount of effort or money expended . . . in developing the information" or the "difficulty with which the data could be acquired or duplicated." *Id.* And Wells does not allege that the data "derives independent economic value from being not generally known or readily ascertainable through proper means." *CAE Integrated, LLC*, 44 F.4th at 262.[10]

"[W]e are not bound to accept as true 'a legal conclusion couched as a factual allegation.'" *In re Ondova*, 914 F.3d at 993. Wells alleges that the data from the "sex selection study" is a trade secret because she says it is. The district court did not err.

_____

[10] Notably, Wells alleges that she is the inventor—rather than the owner—of the alleged trade secrets. Simplot invited her to conduct a sex selection study, but she does not allege that she owned the subsequent research. The distinction between a trade secret owner and a trade secret inventor is an important one. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(3-a) ("'Owner' means, with respect to a trade secret, the person or entity in whom or in which rightful, legal, or equitable title to, or *the right to enforce rights in, the trade secret is reposed*." (emphasis added)).

## VII

Finally, Wells claims that the district court improperly denied her request to amend her complaint as "futile" because she only amended her complaint once and discovery had been stayed.

"We review a district court's denial of leave to amend under Rule 15(a) for an abuse of discretion." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872 (5th Cir. 2000). But Rule 15 requires that a trial court "freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). Accordingly, "[u]nless there is a 'substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial.'" *Stripling*, 234 F.3d at 872 (citation omitted). An amendment is futile if "the amended complaint would fail to state a claim upon which relief could be granted." *Id*. at 873.

Here, the district court found that the defects in Wells's claims could not be cured by any factual development due to the limitations periods, sovereign immunity, or an inability to "state a claim upon which relief could be granted." *See id*. Additionally, "a movant must give the court at least some notice of what his or her amendments would be and how those amendments would cure the initial complaint's defects." *Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204, 1209 (5th Cir. 2021), *as revised* (Nov. 26, 2021) (citing *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016)). Wells has not explained how an amendment would—or could—cure her pleading deficiencies. We find no abuse of discretion.

\* \* \*

The district court's judgment is AFFIRMED.